## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| ADAM JOHNSON, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | Case: 1:17-cv-01928 (CM) |
| | * | |
| CENTRAL INTELLIGENCE AGENCY, | * | |
| | * | |
| Defendant. | * | |
| | * | |

\*      \*      \*      \*      \*      \*      \*      \*      \*      \*      \*      \*      \*

### *AMICI CURIAE* BRIEF IN OPPOSITION TO DEFENDANT'S
### MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT
### OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

The Government Accountability Project, Government Information Watch, National

Security Counselors, the New Venture Fund (d/b/a Demand Progress), and the Project on

Government Oversight (collectively "Amici") respectfully submit this *Amici Curiae* Brief in

Opposition to Defendant's Motion for Summary Judgment, Dkt. #16 (filed Aug. 25, 2017), and

in Support of Plaintiff's Motion for Summary Judgment, Dkt. #21 (filed Sept. 22, 2017).

### INTERESTS OF *AMICI CURIAE*

Amici are non-profit institutions focused on the preservation of open, accountable

government through advocacy, many of which file and litigate Freedom of Information Act

("FOIA") requests, both on their own behalf and on behalf of clients, in order to inform and

educate the public about government operations and activities.  Together they collectively file

hundreds if not thousands of FOIA requests each year, many with law enforcement, defense, and

intelligence agencies.  Their interest in this case is to ensure that the Central Intelligence Agency

("CIA") and other agencies are not permitted to create such a significant exception to the well-

established prior official disclosure doctrine that the doctrine itself is rendered virtually ineffective.

As frequent FOIA requesters, litigators, and advocates which often file and/or litigate complex requests, Amici are very familiar both with the prior official disclosure doctrine and the protection of intelligence sources and methods pursuant to the National Security Act.  Both practices are sound, well-established fixtures of modern FOIA administration, which until this case have never been argued to be at odds with one another.  Because of the universal applicability of the prior official disclosure doctrine as a "threshold" test which precludes the use of *any* FOIA exemptions, this Court should deny CIA's Motion and grant Plaintiff's Motion.

## ARGUMENT

CIA's supplemental brief primarily relies on two arguments, both of which are fundamentally at odds with the well-established case law governing prior official disclosure.[1] First, it argues that the National Security Act creates some sort of exception to the prior official disclosure doctrine as long as the agency was "protecting intelligence sources and methods" when it released the otherwise exempt records to private parties through an official and documented disclosure.  Then it argues that even if the National Security Act does not create an exception to the rule, it did not disclose the information to a large enough number of people for it to be "truly public."  These arguments cannot be reconciled with the prior disclosure doctrine recognized in this and other circuits without the creation of a completely new exception to the exception.

---

[1] CIA makes several other minor arguments based on intentional or mistaken mischaracterizations of the relevant case law which Amici will not address herein, since none of them can independently affect the Court's calculus in the absence of the arguments discussed in this brief.

2

I.      **EXEMPTIONS DO NOT APPLY IN CASES OF PRIOR OFFICIAL**

**DISCLOSURE**

Despite being provided with an opportunity to present arguments about the FOIA statute

and the FOIA prior official disclosure doctrine, CIA instead submitted a brief discussing a

separate statute, the National Security Act of 1947.  In doing so, CIA appears to have missed the

point.  The prior official disclosure doctrine, also called the "public domain doctrine" and the

"official acknowledgement doctrine," is not a product of the National Security Act; it is a

product of *FOIA*.  The distinction is critical, and it is the first fatal flaw in CIA's analysis.

To best understand this distinction, it is first important to review the legal framework

which allows an agency to withhold *any* information from a FOIA request based on *any* statute.

Simply put, statutes like the National Security Act are not "self-executing" when it comes to

FOIA requests.  The only reason that agencies are allowed to cite to a statute as a basis for

withholding information is because Subsection 552(b)(3) *of the FOIA statute* expressly

incorporates other statutes which would otherwise control an agency's ability to publicly release

information.  However, if Subsection 552(b)(3) were absent from the FOIA statute, an agency

*would not be able to withhold information based on another statute*.  It would not matter if the

statute expressly forbade an agency from releasing a certain type of record; FOIA's disclosure

mandate would trump that statute, and courts would interpret it to prohibit the agency from

releasing that type of record *except in response to a FOIA request*.

This two-step process is why CIA's argument must fail.  If a statute cannot authorize an

agency to withhold information from a FOIA requester without the intermediary empowerment

of Exemption (b)(3), then any legal rule which negates Exemption (b)(3) necessarily prohibits

the agency from withholding information pursuant to the underlying statute.  The prior official

disclosure doctrine is just such a rule.  According to that doctrine, if a piece of information has previously been "made public through an official and documented disclosure," *Fitzgibbon v. CIA*, 911 F.2d 755, 765 (D.C. Cir. 1990), *no exemptions apply*.  It is a threshold test which, if satisfied, negates the entirety of Section 552(b).  It does not matter how many exemptions apply or how much alleged damage the release of the information could cause.[2]  If a document exists which is a highly classified (Exemption (b)(1)) privileged ((b)(5)) personal medical ((b)(6)) report which reveals an intelligence method ((b)(3)), a law enforcement technique ((b)(7)(E)), and proprietary commercial information ((b)(4)), and an agency official releases it through an official and documented disclosure to a member of the public, that agency cannot withhold it from a FOIA requester, and a court cannot even entertain the argument that any of those exemptions apply because *no exemptions apply*.

"Under [the] public-domain doctrine, materials normally immunized from disclosure under FOIA lose their protective cloak once disclosed and preserved in a permanent public record."  *Cottone v. Reno*, 193 F.3d 550, 554 (D.C. Cir. 1999) (citing *Niagara Mohawk Power Corp. v. DOE*, 169 F.3d 16, 19 (D.C. Cir. 1999) (Exemption (b)(4)); *Public Citizen v. Dep't of State*, 11 F.3d 198, 201-03 (D.C. Cir. 1993) (Exemption (b)(1)); *Davis v. DOJ*, 968 F.2d 1276,

---

[2] As an aside, the fact that CIA sent this information from an unclassified email system to three unsecure public email servers severely undercuts CIA's claims of potential harm, since this information could—and likely would—have been provided to the journalists through more secure means if it were truly as sensitive as CIA alleges.  An agency which informs a court that "strict segregation of information in the [classified] environment from unclassified systems is necessary to ensure that sensitive national security information is not compromised by foreign intelligence services, terrorist organizations, and other hostile actors that pose a threat to the Agency . . . [and] to ensure that classified information is not, either unwittingly or intentionally, released into the public domain" (Suppl. Lutz Decl., Dkt. #59-1, ¶ 47 (filed Mar. 7, 2014), *Nat'l Sec. Counselors*, No. 11-445 (D.D.C.), attached as Ex. A), is not an agency which sends truly sensitive national security information from an unclassified server capable of being

4

1276 (D.C. Cir. 1992) (Exemptions (b)(3) & (b)(7)(C)); *Afshar v. Dep't of State*, 702 F.2d 1125, 1130-34 (D.C. Cir. 1983) (Exemptions (b)(1) & (b)(3)).  This rule tellingly does not include the phrase "unless the agency has a good reason to withhold it," nor does it say "unless the agency released the information to protect intelligence sources and methods."  *All* "materials normally immunized from disclosure under FOIA lose their protective cloak once disclosed and preserved in a permanent public record."  *See also Wolf v. CIA*, 473 F.3d 370, 378 (D.C. Cir. 2007) ("[W]hen information has been 'officially acknowledged,' its disclosure may be compelled even over an agency's *otherwise valid exemption claim*.") (emphasis added); *Schwartz v. DEA*, No. 13-5004, 2016 U.S. Dist. LEXIS 3696, at *38 (S.D.N.Y. Jan. 8, 2016) (same) (quoting *Wolf*)

Moreover, it does not matter *why* the agency official made the information public, only that it *was* made public.  For instance, even an accidental release is still enough to constitute prior official disclosure if it was documented.  *See Memphis Publishing Co. v. FBI*, 879 F. Supp. 2d 1, 11-12 (D.D.C. 2012) (holding that inadvertent FOIA release waived agency's ability to exclude information about a confidential informant because it was "an 'official' communication by an agency, made by personnel authorized to make such a disclosure" and "'inadvertent' is not the same thing as 'unofficial'").  CIA attempts to avoid this inevitable fact by misquoting an inapposite rule out of context, namely that "one official's decision to disclose particular information in one context cannot 'bind' the government to 'make the same determination, in a different context.'"  (Suppl. Mem. of Law Supp. CIA's Mot. Summ. J., Dkt. #29, at 7-8 (filed Feb. 14, 2018) [hereinafter CIA's Suppl. Mem.] (quoting *CIA v. Sims*, 471 U.S. 159, 181 (1985)).)  Contrary to the description CIA provides for this citation, the *Sims* case involved a fact

---

"compromised by foreign intelligence services, terrorist organizations, and other hostile actors that pose a threat to the Agency" to one—let alone three—private email servers.

pattern where the former Director had authorized the disclosure of *some* institutions' names and

the agency was later withholding *other* institutions' names.  *Sims*, 471 U.S. at 180-81.  The

agency was *not*, as CIA implies, withholding the *same information* after a prior official release,

but rather *similar* information, which, as this Court already explained, does not implicate the

prior official disclosure doctrine.

   Despite the fact that the only question before the Court is whether or not a FOIA doctrine

applies, it is noteworthy how assiduously CIA attempts to argue that this case is about the

National Security Act.  The first major discussion of any statutory language solely focuses on the

National Security Act.  (CIA's Suppl. Mem. at 6.)  CIA later comments on the Court's

interpretation "[of] the National Security Act" before concluding that "there is nothing in the

National Security Act" prohibiting CIA's actions.  (*Id.* at 8.)  This last statement is both accurate

and completely unhelpful to CIA's argument.  CIA is correct that the National Security Act

allows the limited disclosure of otherwise protected information in particular instances, just as

Executive Order 13,526 allows the limited disclosure of properly classified information to

people without a security clearance in particular instances.  However, a significant number of

Exemption (b)(3) statutes allow for discretionary disclosures,[3] and yet those disclosures are not

magically rendered not subject to the prior official disclosure doctrine simply because the

limited disclosure was authorized.  This Court should decline CIA's invitation to transform the

---

[3] Exemption (b)(3) incorporates any other statute which satisfies one of two criteria, only one of
which leaves no discretion to the agency.  *See* 5 U.S.C. § 552(b)(3)(A) (including any statute
which "(i) requires that the matters be withheld from the public in such a manner as to leave no
discretion on the issue; or (ii) establishes particular criteria for withholding or refers to particular
types of matters to be withheld").

National Security Act into some kind of "super" Exemption (b)(3) statute that operates beyond the bounds of normal FOIA jurisprudence.[4]

## II.    ALL PUBLIC DISCLOSURES ARE CREATED EQUAL

CIA's second attempt to avoid the application of the official prior disclosure doctrine suffers from just as many logical and legal flaws as its first.  Despite the weight of case law to the contrary, CIA argues that information must be widely disseminated to be "truly public," and that disclosing the information to three journalists does not satisfy that exacting standard. (CIA's Suppl. Mem. at 10-14.)  The problem with this argument is that, with one possible exception, none of the cases cited defines "truly public" in the terms CIA uses the phrase, and that, accordingly, "It [does not] follow . . . that a limited disclosure of information [to members of the public] does not effect a waiver of FOIA's exemptions."  (*Id.* at 11.)

In an effort to bolster this argument, CIA cites, *inter alia*, *Judicial Watch v. DOD*, 963 F. Supp. 2d 6 (D.D.C. 2013).  Of the cases CIA cites, this one best illustrates both the pedigree of the prior official disclosure doctrine and the correct meaning of "truly public."  Judge Contreras defined being "released to the general public" as meaning simply that "the information 'has entered and remains in the public domain.'"  *Id.* at 12 (quoting *Davis*, 968 F.2d at 1279).  As an initial matter, CIA has given the Court no reason to believe that the journalists in question have

---

[4] For similar reasons, CIA's assertion that it is "entitled to the broadest possible deference" (CIA's Suppl. Mem. at 17-18) has no basis in law.  Courts are required to give substantial deference to intelligence agencies on the question of whether or not information is properly exempt under Exemptions (b)(1) or (b)(3), *not* whether information was previously officially disclosed.  The fact that the information is being withheld under those exemptions does not entitle CIA to *any* deference on the waiver issue, since, as noted above, no exemptions apply if there has been prior official disclosure, and therefore there is no applicable exemption claim for the Court to give substantial deference *to*.  CIA's argument is akin to saying that it is entitled to substantial deference on the adequacy of its search or whether it properly determined certain

not continued to retain the emails, and so it naturally follows that if the Court finds that these emails *entered* the public domain by virtue of being sent to private parties, then it must find that they *remain* in the public domain unless CIA demonstrates otherwise.

Judge Contreras relied primarily on three cases to make this pronouncement and the other relevant quote from this case, "The logic of the public domain doctrine is that 'where information requested is 'truly public,' then enforcement of an exemption cannot fulfill its purposes.'" *Id.* (quoting *Cottone*, 193 F.3d at 554, & *Niagara Mohawk*, 169 F.3d at 19).  First, he relied on *Students Against Genocide v. Department of State* ("*SAGE*"), which provides the definition for "truly public" which is most applicable to this case, by contrasting it with information which was simply *shown* to members of the public and not *given* to them.  257 F.3d 828, 836 (D.C. Cir. 2001) ("In fact, the photographs were not 'released' at all.  Although Ambassador Albright displayed them to the delegates, she retained custody, and none left the U.N. chamber. . . . Hence, there is no 'permanent public record' of the photographs.") (quoting *Cottone*, 193 F.3d at 554).  *This* is the most common definition for "truly public," best understood as any physical record which has been allowed by the Government to remain in the hands of a non-governmental entity.  It is the same definition applied later in *Muslim Advocates v. DOJ* to find that the fact that a small number of members of the public were allowed to review and make notes on records did not constitute public disclosure because they were not allowed to take the records from the building.  833 F. Supp. 2d 92, 100 (D.D.C. 2011).

In fact, *Muslim Advocates* presents the answer to CIA's contention that the fact that only a small number of private citizens—the three journalists in question—were sent the emails

---

records to be non-responsive simply because it was searching for national security records, which is plainly not the case.

means that they were not "truly public."  In that case, the Federal Bureau of Investigation only showed the information in question to a small number of representatives from civil rights and civil liberties groups, and yet the court's finding relied *solely* on the fact that those representatives were not allowed to keep copies of the records.  It is therefore *not* the number of people to whom a record is disclosed which decides this question, as CIA argues, but instead whether or not those people are allowed to keep a permanent copy of the record.

Judge Contreras also chiefly relied on *Niagara Mohawk*, the opinion which coined the term "truly public."  The main problem with this citation is that *Niagara Mohawk* never actually defines this term, and the contextual meaning of it is very unclear.  The opinion stated, "Niagara's position here is a little odd: if the information is publicly available, one wonders, why is it burning up counsel fees to obtain it under FOIA?  But the logic of FOIA compels the result: if identical information is truly public, then enforcement of an exemption cannot fulfill its purposes."  169 F.3d at 19.  No further mention of what "truly public" means is included in the opinion, as the remainder of the opinion is devoted to discussing whether or not the information is public *at all* (*see id.* at 19-20)  It therefore appears that the court was only concerned with the public vs. non-public distinction, such that if the requester could show that an agency record was disclosed outside the Government (in that case, to the New York Public Service Commission), then it was "truly public."

The final case upon which Judge Contreras relied is *Davis*, the opinion which coined the term "permanent public record" in this context.  Again, the context of that case does not support CIA's position in this case.  In that case, portions of confidential law enforcement records were entered into the record during a trial, and the plaintiff argued that this waived any exemptions over those records.  968 F.2d at 1279-1280.  However, as the D.C. Circuit clearly stated *at the*

*beginning* of its discussion of the matter, "This case appears to turn on the proper allocation of the burden of proof or the burden of production." *Id.* at 1279. The court never addressed whether or not the information was disclosed; its entire discussion focused on whether the plaintiff *had proven* that it was disclosed. There was no discussion of the number of people in the room when it was disclosed, or whether they were allowed to keep copies; it was *solely* about the burden of proof. Amici do not disagree with this opinion in the slightest, because it supports *their* position. It has been clearly proven that these emails were released to individuals outside the Government and that they likely remain in the custody of those individuals, and according to *Davis*, that satisfies Plaintiff's burden.

It is important, however, to address the fact that even though the cases on which Judge Contreras relied do not stand for the propositions for which CIA cites them, Judge Contreras himself found that information disclosed to the filmmakers in his case was not "publicly disclosed." *Judicial Watch*, 963 F. Supp. 2d at 15-16. However, this opinion is consistent with Plaintiff's position. The important distinction between this case and *Judicial Watch* is that, in *Judicial Watch*, *information* was *told* to outside parties, while in this case, *records* were *given* to outside parties. This distinction places *Judicial Watch* in the same category as *SAGE* and *Muslim Advocates*, in which outside parties were given *access* to information without the ability to *prove* its authenticity. If any of the outside parties in either of those cases were to try and make claims regarding what that information was, the only evidence they would have for their claims would be *their word*, whereas an outside party who possesses *a physical document* has *proof.*[5] This same logic explains why a release of a document through FOIA to *a single*

---

[5] This distinction is the reason for CIA's observation that there is a government interest in "preserving the options of deniability and professed ignorance that remain important niceties of

*requester who never disseminates it* constitutes a waiver for all other requesters. *See Inst. for Policy Studies v. CIA*, 885 F. Supp. 2d 120, 141 (D.D.C. 2012); *Memphis Publishing Co.*, 879 F. Supp. 2d at 11. It does not matter whether or not the individual in possession of the document has disseminated it further; it only matters whether or not he *can*. Viewed through this lens, it is clear that the information contained in these emails have been publicly disclosed because any of these journalists (or any colleagues with whom they shared the emails) *could* publicly release them at any time, and CIA would have no ability to stop them.[6]

In fact, only one case cited by CIA might actually reflect a judicial endorsement of its definition of "truly public," and even that case is not as it appears. In *Klayman v. CIA*, the plaintiff sought records of all communications between CIA and a local prosecutor and judge about an alleged covert employee. 170 F. Supp. 3d 114, 117 n.2 (D.D.C. 2016). However, like many of the other cases cited above, there was no evidence in that case that any of the alleged communications were *written*, and in fact, the judge noted the absence of any probative evidence that the communications took place in the first place. *Id.* at 123-24 (commenting that proffered

---

international relations. (CIA's Suppl. Mem. at 15 (quoting *Wilson v. CIA*, 586 F.3d 171, 195 (2d Cir. 2009)).) As long as a reporter has no *physical proof* that a government record exists, there is "some increment of doubt regarding the reliability of publicly available information." *Wilson*, 586 F.3d at 195.

[6] In fact, CIA's entire argument about the relevance of the fact that, in *Judicial Watch*, "the Under Secretary specifically asked that the names not be publicly revealed, and the filmmakers complied" (CIA's Suppl. Mem. at 13 (citing *Judicial Watch*, 963 F. Supp. 2d at 15)) is, with all due respect to Judge Contreras, based on a fundamentally flawed legal premise. Even assuming *arguendo* that the journalists in question had expressly agreed not to disseminate the information —which CIA has not alleged—such a fact would not be relevant to this inquiry. An agreement not to share information is at best a contract, and an agency cannot avoid a statutory mandate by way of a contract with a private party. If the Court finds that sending this written information to three journalists would *ever* constitute a prior official disclosure, it does not need to consider whether the journalists agreed not to publish it because any such agreement would not change

evidence such as statements from alleged employee's wife and lawyer and press reports sourced to anonymous government officials do not meet standard for official acknowledgement).

In fact, the only sentence in *Klayman* which appears to actually represent an agreement with CIA's argument in the instant case is the one quoted by CIA: "It defies commonsense [sic] to argue that any time a CIA official allegedly communicates with a third party, any such communication (if, in fact, one exists) has been 'made public' and is thus subject to FOIA disclosure." *Id.* at 123. However, because of the ample discussion of the plaintiff's failure to proffer probative evidence, this sentence is mere dictum, and this Court should not accept CIA's invitation to issue a decision fundamentally redefining the prior official disclosure doctrine based solely on one piece of unsupported (as demonstrated above) dictum from a single district judge in another circuit.

Simply put, contrary to the core premise of CIA's brief, one official's decision to disclose particular information in writing to a private non-government party most assuredly binds the same agency to disclose the same information to a FOIA requester. In 1972, CIA officials began requiring employees to file internal reports about such "authorized" leaks specifying, *inter alia*, the name of the official who authorized the disclosure and why. (*See* Report of Leak of Intelligence Information at 2, attached as Ex. B.) If the Court is uncertain about whether or not the information in question was officially disclosed by a CIA official who had official authorization to disclose it to these private parties, it should order CIA to submit this documentation for judicial review.

---

CIA's statutory responsibilities under FOIA to only withhold information which has not been previously officially disclosed.

Before closing, Amici will briefly point out as an aside that the presumably extensive

discussion of the withheld subject matter which is redacted from the public filing is entirely

irrelevant to the question of whether or not these emails constituted a prior official disclosure of

otherwise exempt information, and the Court should disregard it and, if the Court rules in

Plaintiff's favor, immediately order all of CIA's *ex parte*, *in camera* filings—as well as its own

19 January 2018 Memorandum Order—to be published in full unredacted form on the public

record, since the information they seek to keep secret will have been found by the Court to reside

in the public domain and therefore not appropriate for sealing.

## <u>CONCLUSION</u>

For the reasons provided above, CIA's brief cannot be reconciled with well-established

FOIA case law, and the Court should rule in Plaintiff's favor.

Date:   March 16, 2018

<div style="margin-left:40%">

Respectfully submitted,

 /s/ Kelly B.  McClanahan     
Kelly B.  McClanahan, Esq.
S.D.N.Y. Bar #KM1958
National Security Counselors
4702 Levada Terrace
Rockville, MD  20853
301-728-5908
240-681-2189 fax
Kel@NationalSecurityLaw.org

*Counsel for Amici Curiae*

</div>