UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

————————————————————————x

ADAM JOHNSON,

Plaintiff,

-against-

CENTRAL INTELLIGENCE AGENCY,

Defendant.

————————————————————————x

| USDC SDNY |
| DOCUMENT |
| ELECTRONICALLY FILED |
| DOC #: |
| DATE FILED: 4/26/18 |

17 Civ. 1928 (CM)

## MEMORANDUM DECISION AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

McMahon, C.J.:

This opinion is further to the court's Memorandum Order dated January 19, 2018

(hereinafter, "the January 19 Order"). This opinion and the January 19 Order should be read

together, so the court will not here repeat any of the background discussion in that order.

**The CIA's Argument in Support of its Motion for Summary Judgment**

In response to the invitation extended by the court at the conclusion of the January 19

Order, the Government has filed the Reply Brief that it should have filed in the first instance. It

argues as follows:

First, Exemptions 1 and 3 apply to CIA's provision of the five emails in question to a

select group of reporters. Exemption 1 applies because the material redacted from the five emails

that are the subject of this litigation is classified. And Exemption 3 applies because The National

Security Act, grants the CIA "broad discretion" and "sweeping power" to protect intelligence

sources and methods, and to do whatever may be necessary, in CIA's discretion, to exercise that

power. National Security Act of 1947, 50 U.S.C. § 3024-1(i)(1)(2013). The Supreme Court has

1

thus recognized that the NSA authorizes the CIA to undertake limited and selective disclosure of information that may lead to the identity of intelligence sources when it is in the national interest to do so—including specifically when such disclosure is necessary in order not to compromise the agency's carrying out of its mission. *CIA v. Sims*, 471 U.S. 159 (1985).[1]

Second, sending highly classified information at issue in this case *via* email to the selected reporters—

—did not waive the protections of Exemptions 1 and 3, because the full content of those emails has not been "made public;" that is, the emails have not entered into the public domain. The full content of the emails is known only to the sender (CIA's Office of Public Affairs) and the recipients (the journalists who received the emails, and perhaps certain of their colleagues at their respective newspapers). CIA notes that the so-called public domain doctrine—pursuant to which materials ordinarily immunized from disclosure lose their "protective cloak" when they are both "disclosed" to persons not ordinarily authorized to see that information and "preserved in a permanent public record," (*Ashfar v. Dept. of State*, 702 F. 2d 1125, 1130-34 (D.C. Cir 1983); cited in *Cottone v. Reno*, 193 F. 3d 550, 554 (D.C. Cir. 1999); *Niagara Mohawk Power Corp v. DOE*, 169 Fed 3d 16, 19, (D.C. Cir. 1999))—has been described as a "doctrine of futility," (*Judicial Watch, Inc. v. U.S. DOD*, 963 F. Supp. 2d 6, 12 (D.D.C. 2013)). Since the reporter-recipients do not seem to have disclosed the contents of the five emails to the general public—for if they had, Plaintiff would not need to file a FOIA request, *see, Muslim Advocates v. United States Department of Justice*, 833 F. Supp. 2d 92, 101, n.7—CIA insists that it would not be "futile" to keep them from persons such as plaintiff, to whom the Director has, for reasons of his own that are of no concern to this court, not disclosed them.

---

[1] So much of the January 19 order as suggested otherwise is hereby vacated.

In support of this argument, CIA points to a number of cases in which CIA made limited disclosures to persons not otherwise authorized to see classified material in furtherance of its statutorily-conferred power to protect intelligence sources and methods. *See* Gov't Supplemental Memorandum of Law at pp.12-15. In each of those cases, limited disclosure that went no further than the party to whom disclosure was made was held not to waive the protections of FOIA Exemptions 1 and 3, the very exemptions invoked in this case.

**Plaintiff's Argument in Support of His Cross-Motion for Summary Judgment**

Plaintiff was given an opportunity to respond to the Government's brief. Plaintiff himself filed a two page, single spaced letter brief. However, he enlisted the assistance of five parties who engage frequently in FOIA litigation against the CIA: The Government Accountability Project, Government Information Watch, National Security Counselors, the New Venture Fund (d/b/a Demand Progress), and the Project on Government Oversight. Collectively, these institutions sought leave to appear in this case as *amici curiae*, and to file a brief in support of Plaintiff's motion for summary judgment and opposition to the CIA's motion. In this instance, *amici* truly are acting as "friends of the court," as they have a wealth of experience in this type of litigation and were able to make more sophisticated arguments on Plaintiff's behalf than he did himself.

Plaintiff's and *Amicis'* position can be summarized as follows:

First, they agree that the National Security Act authorizes limited disclosure of otherwise protected information in particular instances. (*See* Brief of *Amici Curiae* at 6). That being so, it is undisputed that CIA could ordinarily rely on Exemption 3 to bar disclosure of the withheld material:

> Exemption 3 differs from other FOIA exemptions
> in that its applicability depends less on detailed factual

3

> contents of specific documents, the sole issue for decision
> is the existence of a relevant statute and the inclusion of
> the withheld material within the statute's coverage.

*Association of Retired R.R. Workers v. United States R. R. Retirement Board*, 830 F. 2d 331, 336
(D.C. Cir. 1987), quoting *Goland v. CIA*, 607 F. 2d 339, 350 (D.C. Cir. 1978), *cert denied*, 445
U.S. 927 (1980).

Second, they argue that nothing in the National Security Act exempts CIA from the usual
rule that prior official disclosure of otherwise protectable classified information waives FOIA
protection for that information— even if CIA is acting to protect intelligence sources and
methods. They thus contend that CIA's Exemption 3 protection—like any other exemption from
FOIA disclosure—is waivable. I think it is fair to say that the Government has not here argued to
the contrary; rather, as indicated above, it argues that FOIA protection has not been waived,
because the selective disclosure described above is not disclosure to the public generally.

Third, Plaintiff and Amici contend that the CIA has indeed waived its right to rely on the
applicable FOIA exemptions, because it chose to send the confidential information to the
journalists in emails, instead of bringing them in for an oral briefing or a show-and-tell. This,
they urge, means that CIA caused the information so disclosed to be "preserved in a permanent
public record," thereby losing its "protective cloak." They argue—correctly—that in all of the
cases cited by the Government, as well as in additional cases cited by *Amici*, the disclosed
information was conveyed to the authorized recipients either by telling it to them or by showing
it to them. In no instance were the recipients able to retain permanent copies of exactly what was
disclosed to them in their files. Here, by contrast, CIA deliberately sent the emails to selected
reporter-recipients at their email addresses at three major newspapers. Nothing would have
prevented the reporter-recipients of those emails from printing them out, sharing them on screen

4

or in print form with others, and preserving them on their computers. That, they urge, is a difference that makes a difference, because it created a "permanent public record" of the disclosed information.

## Discussion

The court will begin by summarizing the principal cases discussing the public disclosure doctrine; I will then analyze the principles thus disclosed to the first-impression facts of this case.

*The Public Disclosure Doctrine*

Courts, including specifically this one, have long recognized that information could not remain classified after it had been "specifically revealed to the public." *See Lamont v. Department of Justice,* 475 F. Supp. 761, 772 (S.D.N.Y. 1979) (Weinfeld, J.). However, what we now call the "public disclosure doctrine" has been developed over four decades principally by the courts in the District of Columbia Circuit, which (at least until recently) have handled the lion's share of FOIA cases addressed to the CIA and other Executive Branch agencies involved in the national security arena.

One thing comes through from reading those cases from oldest to newest: the courts most often entrusted with applying Exemptions 1 and 3 to the CIA have bent over backwards to protect CIA and sister agencies (principally the Departments of Justice and State) from having to disclose anything that the CIA deems to fall within the ambit of the term "intelligence sources and methods." As a result, the courts have heavily circumscribed what action on the part of CIA officials could possibly constitute a waiver of Exemptions 1 and 3.[2]

---

[2] The parties focus their latest submissions on CIA's reliance on Exemption 3 (express statutory authority to keep information secret). However, CIA also here invokes Exemption 1 (the information requested has been duly classified). The same arguments and analysis that apply to the invocation of Exemption 3 in this circumstance also apply to the invocation of Exemption 1, as the D.C. Circuit recognized in *Public Citizen v. Dep't. of State,* 11 F. 3d 198, n.4 (D.C. Cir. 1993): "[E]xemptions 1 and 3 have essentially identical aims: to preserve the Executive's freedom to refuse to disclose information that might compromise national security or foreign policy. In such cases, the [same] criteria are equally applicable to both exemptions." For that reason, the discussion that follows should be

5

As discussed in the January 19 Order, the two "Glomar Explorer" cases—*Military Audit Project v. Casey*, 656 F. 2d 724 (D.C. Cir. 1981) and *Phillippi v. CIA*, 655 F.2d 1325 (D.C. Cir. 1981)—at the very least stand for the proposition that selective disclosure of information by the CIA to certain journalists in the hope of avoiding misreporting that might disclose intelligence sources and methods does not automatically waive FOIA protection for that information. That, of course, is more or less what happened here— with the key factual twist identified by Plaintiff and Amici.

In the years that followed the Glomar Explorer cases, the courts have had an opportunity to flesh out this principle more thoroughly.

In *Afshar v. Department of State*, 702 F.2d 1125 (D.C. Cir. 1983), plaintiffs sought disclosure of documents pertaining to him that were in the files of the Departments of State and Justice and the CIA. Plaintiff argued that the agencies had waived the right to rely on FOIA exemptions (including specifically Exemption 3 for the CIA) because "substantially the same information" that he believed was contained in those documents was already in the public domain.

Ashfar's request for disclosure of the documents was rejected. After noting that FOIA "bars courts from prying loose even the smallest bit of information that is properly classified or would disclose intelligence sources and methods" (*Ashfar*, 702 F.2d at 1130), the D.C. Circuit held that a FOIA plaintiff bears the burden of proving that the information he seeks is (1) exactly the same (not "substantially similar") as (2) information that is already in the public domain.

The stringency (from the plaintiff's perspective, that is) of what quickly became known as the *Ashfar* test for deciding whether FOIA protection for national security information had been

---

deemed applicable to both of the invoked exemptions, "making no attempt to separate our analyses of the two exemptions and no suggestion that there [is] any need to do so." *Id*

waived by the Executive was made clear in *Fitzgibbon v. CIA*, 911 F.2d 755 (D.C. Cir. 1990) and *Public Citizen v. Dep't of State*, 11 F.3d 198, 202 (D.C. Cir. 1993).

In *Fitzgibbon*, the district court held that the CIA had waived its right to rely on Exemption 3 for information relating to the location of a particular CIA station in Iran because, in 1975, a congressional committee report had revealed the station's location. The Court of Appeals reversed, concluding that this official publication, which did not disclose the station's whereabouts in the years prior and subsequent to 1975, did not operate as a waiver for any year except 1975.[3] The court went on to say:

> We have unequivocally recognized that the fact that information resides in the public domain does not eliminate the possibility that further disclosures can cause harm to intelligence sources, methods and operations.

Fitzgibbons, 911. F.2d at 766. The court concluded that information would not be deemed to have been "officially acknowledged" unless it had been "made public through an official and documented disclosure." *Id.* at 765. There having been no such disclosure of the station's whereabouts for any year except 1975, the court found no waiver except as to the location of the station during that calendar year.

Of great significance to this court, the *Fitzgibbon* standard for what constitutes "official acknowledgement" of a fact has been adopted by the Second Circuit. *See Wilson v. CIA*, 586 F. 3d 171, 186 (2d Cir. 2009). That standard requires that the information requested must (1) be as specific as the information previously released; (2) match the information previously disclosed; and (3) already have been made public through an official and documented disclosure.

---

[3] As this court has had occasion to observe on several prior occasions, a doctrine has subsequently developed—in the Second Circuit, anyway—whereby the disclosure of information that is classified or protected by the National Security Act or the CIA Act by anyone other than the CIA does not waive the CIA's right to rely on Exemptions 1 and 3. *See Wilson*, 586 F. 3d at 186-87. Under the *Wilson* test, *Fitzgibbon* would have been decided for the CIA on the ground that disclosure by Congress was insufficient to waive the CIA's assertion of FOIA protection, even as to the year 1975.

7

In *Public Citizen, supra*, the plaintiff argued that reliance on relevant FOIA exemptions had been waived because a State Department spokesman (Ambassador April Glaspie) had voluntarily made public statements during Congressional testimony about her meeting with Saddam Hussein in the days just prior to Iraq's invasion of Kuwait. This, the plaintiff urged, waived FOIA protection for the diplomatic telegrams that she dictated and cabled back to Washington about that meeting. Plaintiff contended that, unless waiver was recognized in this circumstance, the Government would be free to reveal otherwise privileged information "selectively" for its own advantage.

The D. C. Circuit made short work of Public Citizen's "selective disclosure" argument, holding that it could not be "squared with the case law of this circuit," because the plaintiff was required to demonstrate that the "specific information" contained in the telegrams it sought was identical to Glaspie's congressional testimony. In reaching this conclusion, the Circuit followed the earlier cases of *Military Audit* and *Phillippi*, both of which had rejected the argument that CIA's disclosure of some information about the Glomar Explorer caper waived FOIA protection for all information relating to that subject. *See also, Wolf v. Central Intelligence Agency*, 473 F. 3d 370 (D.C. Cir. 2007)(CIA's right to assert Glomar response to FOIA request in reliance on Exemptions 1 and 3 not waived by virtue of testimony before Congress over a half century earlier, except insofar as that testimony disclosed the existence of CIA records concerning a Colombian politician).

The court fully understood that it was imposing an almost insuperable burden on a FOIA plaintiff seeking information about documents relating to national security and foreign affairs:

> We recognize that this is a high hurdle for a FOIA plaintiff to clear,
> but the Government's vital interest in information relating to national
> security and foreign affairs dictates that it must be. Even if our precedents
> did not command the result we reach today, we would be unwilling to

8

> fashion a rule that would require an agency to release all related materials
> any time it elected to give the public [any] information about a classified matter.

*Public Citizen*, 11 F.3d at 203.

These earliest post-Glomar cases deal with the congruence between the information

sought by a FOIA plaintiff and the information in the public domain. A second line of cases

discusses when information will be deemed to be in the public domain for purposes of the *Ashfar*

test.

In *Davis v. United States Department of Justice*, 968 F.2d 1276, 1280-81 (D.C. Cir.

1992); *Niagara Mohawk Power Corp. v. United States Dept. of Energy*, 169 F.3d at 16, 19 (D.C.

Cir. 1999) and *Cottone v. Reno*, 193 F.3d 550, 554 (D.C. Cir. 1999), the court made clear that a

FOIA plaintiff also bore a second burden of proving that there is what the court called a

"permanent public record" of the exact information he sought, such that it would be "futile"

(*Judicial Watch, supra.*, 963 F. Supp. 2d at 12) for the Government to contend that protecting the

information from disclosure would do any good. In each such case, the court noted that it could

not compel disclosure of information protected by Exemption 3.[4]

In *Cottone* – a case this court found particularly helpful in its discussion of the interplay

between Exemption 3 and the "permanent public record" test— Plaintiff (a convicted mobster)

sought release of certain wiretapped recordings of conversations between him and undercover

FBI agents who had infiltrated Cottone's organization. The Department of Justice refused to

disclose the tapes, citing Exemption 3; the statute on which it relied was Title III, which requires

the FBI to keep intercepted material confidential. *Cottone, supra.* 193 F.3d at 553.

Some of the recordings sought by Plaintiff had been played at Cottone's trial. The court

granted his request for copies of those recordings, because "audio tapes enter the public domain

---

[4] Although it is not really relevant to the discussion, I note that these three cases did not involve classified or
national security information.

9

once played and received into evidence," *Cottone*, 193 F.3d at 554 (citing *In re National Broadcasting Co.*, 653 F.2d 609, 614 (D.C. Cir. 1981), and because plaintiff was able to identify, with reference to the transcript of proceedings, the exact tapes he wanted.[5]

However, the Court of Appeals denied Plaintiff's request for copies of other tapes, which had neither been played at the trial or otherwise made part of the public record, but which had been turned over to Plaintiff's counsel prior to trial in satisfaction of the Government's discovery obligations. The court held that the requestor failed to meet his burden to demonstrate that there existed a "permanent *public* record of the exact portions he wishes," *Cottone*, 193 F.3d at 554 (emphasis added) (citing *Davis, supra.*, 968 F.2d at 1280), on the ground that, "constitutionally compelled disclosure to a single part simply does not [cause a document to] enter the public domain." *Cottone, supra.*, 193 F.3d at 556.

The court also observed that, even if the tapes were deemed to reside in the public domain by virtue of having been provided to Cottone's lawyer, Cottone had not satisfied his burden of showing which specific tapes the Government had tendered to his attorney during pretrial discovery– a fact of which there was no record in the transcript or any other publicly-available source. In so doing, the court obviously rejected Cottone's position that it was enough for him to say, "Give me exactly what you gave to my attorney." However, this was at best an alternative holding.

---

[5] In so doing, the court distinguished *United States v. Davis, supra.*, a most unusual case, in which it was held that tapes of wiretapped conversations that were obtained by the Government pursuant to Title III and played in open court at a criminal trial did not have to be turned over to the defendant—notwithstanding the usual rule that audio tapes played in open court are ordinarily within the public domain—but only because the court reporter had failed to create a "permanent public record" of which tapes out of the many tapes that were made during the course of the Government's investigation were actually played during the trial. Because of that extraordinary lapse, the plaintiff— an author whose book discussed the relationship of the Mafia to the assassination of President John F. Kennedy— could not identify which specific tapes had been played during the trial. This fact pattern is unlikely to recur with any frequency. Indeed, it did not recur in *Cottone*, which is why the Plaintiff obtained release of the tapes that were played at his trial.

10

The *Cottone* decision was noteworthy for another pronouncement relevant to this case. In her decision, Judge Wald decisively rejected any suggestion that the plaintiff could only meet the "high bar" discussed in Fitzgibbon by producing a "hard copy" of the information that had been previously disclosed. *Cottone,* 193 F.3d at 555.

Finally, in a series of even more recent cases, the courts have focused more closely on the method by which the protectable information was shared with the party to whom limited disclosure was made. As noted above, in each such case, the party who received the selective disclosure was not given a copy of the information to which he was made privy. And in each of these cases, that fact was determinative.

In *Students Against Genocide* (SAGE) *v. Department of State,* 257 Fed.3d 828 (D. C. Cir. 2001), the information at issue consisted of intelligence photographs, some of which had been as shown in confidence to members of the United Nations Security Council. SAGE received two such photographs in response to a FOIA request, but fourteen others were withheld by the Department of States. SAGE argued both that the Government had waived the right to withhold the fourteen photographs by showing them to United Nations delegates whose governments were at the time members of the Security Council.

The *SAGE* court held, in line with such precedents as *Military Audit* and *Cottone,* that the public disclosure of two of the photographs did not waive the relevant exemptions (1 and 3) with respect to others. And it concluded that showing the photographs to the U.N delegates did not make them available to the general public.

In its decision, the court placed great store on the fact that the photographs were not "released" at all, but were simply displayed to the members of the Security Council. This was deemed particularly important because the context of this display made it unlikely that the

11

technical capabilities of the reconnaissance systems that took the photographs could be compromised, because they were seen only briefly and by persons who did not themselves possess the technical expertise to perform such analysis.

To SAGE's argument that the disclosure of the photographs to hostile foreign governments—the very parties against whom the statutory exemption was intended to protect— vitiated the danger of disclosing them to the American public, the court responded that it saw nothing unreasonable about the government's contention that it might have affirmative foreign policy reasons for sharing sensitive information with some governments (including unfriendly governments) and not others.

The next step along this path came a decade later, in *Muslim Advocates v. United States Department of Justice*, 833 F. Supp. 2d, 92 (D.D.C. 2011). There, the FBI showed a document known as the Domestic Investigations and Operations Guide (DIOG) to a small number of representatives from civil rights and civil liberties groups. The representatives were not allowed to keep copies of the records they were shown, but they were permitted to take notes. The session lasted for about two hours, which should be enough time to take quite a few notes.

But because they felt they did not have time to take sufficiently extensive notes, the civil liberties groups filed a FOIA request for disclosure of the DIOG. When it was withheld citing Exemption 7(E) (records compiled for law enforcement purposes), they (understandably) argued waiver.

They lost. The court specifically held that the fact that the documents disclosed had to be returned at the end of the meeting, and so were not otherwise available to the plaintiffs and the general public, meant that the limited disclosure described above did not rise to the level of "public" disclosure.

The fact that the representatives were permitted to take notes about the documents they were shown was held not to create a "permanent public record" of the contents of the documents, because the plaintiff had produced (and could produce) no evidence that the specific information being withheld from them could be found in the notes that were taken by the participants. The court's conclusion in this regard rested on the fact that underlay the lawsuit— the people who had reviewed the documents and taken the notes were complaining that they had not been given an adequate opportunity to conduct a "rigorous examination" of their contents, and that two hours with the documents was not sufficient to conduct "a meaningful review." (*Id.* at 101) Judge Sullivan wrote, "As the participants in the November meetings lacked sufficient time for a 'rigorous examination' or 'meaningful review" of the disputed chapters, the Court is not persuaded—absent some evidence to the contrary—that the note-taking participants assembled a permanent public record that 'duplicates that being withheld.'" *Muslim Advocates*, 833 F. Supp. 2d, at 101, (citing *Public Citizen,* 11 F. 3d at 201).

Even the fact that the FBI eventually published portions of the DIOG on its web site did not constitute a waiver of FOIA Exemption 7(E), because Plaintiffs could not demonstrate that there was any public record of the portions of the document that had not been publicly posted.

Finally, in *Judicial Watch v. DOD*, 963 F. Supp. 2d 6 (D.C.C. 2013), the district court held that CIA had not waived its Exemption 3 protection, or placed information in the public domain, by revealing the identities of the NAVY SEALs and CIA officers who were involved in the raid that killed Osama Bin Laden to the filmmakers of the movie "Zero Dark Thirty." The plaintiff became aware of this fact when CIA produced redacted internal email chains (that is, emails not sent to outsiders, as occurred in this case), the contents of which revealed the fact that the names had been shared with the filmmakers. While Judicial Watch argued that giving this

information to the filmmakers had placed it in the public domain, the court said that was not sufficient; the plaintiff also had to show that the information "remained" in the public domain, which it had not done:

> If the filmmakers had publicized the names that they learned and the government now seeks to withhold, this would be a much harder case, one that might turn on the question of whether those names had been "officially acknowledged....." But this is not that case. The names have not been released to the general public," *Students Against Genocide*, 257 F. 3d at 836, and Judicial Watch cannot meet its "initial burden of pointing to specific information *in the public domain* that duplicates that being withheld.

*Judicial Watch, supra.*, 963 F. Supp 2d at 15-16.

Additionally, Judge Contreras pointed out that the public domain doctrine – a "doctrine of futility," *Id.*, at 12 – could not logically apply to the selectively disclosed information because there was no evidence that this information was further disclosed by its original recipients. The lack of wider dissemination meant that enforcement of the exemption could still fulfill its purpose of keeping intelligence sources and methods secret. *Id.* at 16.

This line of cases is the progeny of *Phillippi v CIA*—the only case on which the Government relied the first time around, and to which we now cycle back. In *Phillippi*, it was significant that classified information about the Glomar Explorer had been disclosed by CIA to certain members of the press in telephone conversations among Director William Colby and those reporters and editors, rather than being given to the reporters. Moreover, it was significant that the documents CIA refused to turn over in *Phillippi* consisted of internal CIA documents (transcripts of those telephone conversations and various CIA internal memoranda concerning

the telephone conversations), none of which had been given to the select members of the press who were on those calls.[6]

*Application of The Public Disclosure Doctrine Cases to the Facts of This Case*

What do we learn about our case from these cases?

**First,** The Director of Central Intelligence is free to disclose classified information about CIA sources and methods selectively, if he concludes that it is necessary to do so in order to protect those intelligence sources and methods, and no court can second guess his decision. Numerous cases have so held.

**Second,** no court has ever articulated a "CIA exception" to the public disclosure doctrine, so the CIA can waive otherwise applicable protection from FOIA disclosure—even where information has been disclosed selectively for the purpose of protecting intelligence sources and methods—if it does not handle such disclosures in a manner that prevents the information from becoming "truly public."

**Third,** because of the extraordinarily sensitive nature of the information in the possession of the CIA, and the "sweeping" nature of the Director's power to protect that information, *CIA v. Sims, 471 U.S. 159, 168-69 (1985),* courts have not made it easy for a FOIA plaintiff to obtain selectively disclosed information on the ground that it has become "truly public." In particular, notwithstanding that it is the agency's burden to demonstrate that a FOIA exemption applies, 5 U.S.C. § 552(a)(4)(B), before the agency is required to discharge that burden, the law requires the plaintiff to make a two-pronged showing:

The plaintiff must first demonstrate that he is seeking *exactly* the information that was previously disclosed to someone not ordinarily authorized to receive it. In each of the cases

---

[6] Some of the internal memoranda that the CIA refused to disclose were actually about the telephone calls in which the disclosures were made. *Phillippi,* at 1331.

discussed above, it was impossible for the plaintiff to know (or, at least in the *Muslim Advocates* case, to show) exactly what information had been shared with outsiders. Therefore, most plaintiffs who have tried to jump the first hurdle of the *Ashfar* test have failed.

And the plaintiff must also demonstrate that that precise information he seeks is in the "public domain." Moreover, courts have very narrowly construed what constitutes the "public domain," thereby creating "safe harbors" within which the Director can carry out his statutory duty of protecting intelligence sources and methods via selective disclosure without fear of waiving his FOIA protection. In particular, courts have repeatedly held that, for purposes of the public disclosure doctrine, simply showing or conveying classified or statutorily protected information to third parties, but not allowing them to retain the disclosed information (at least, not in a form that is *in haec verba* with what was disclosed), does not cause the information to enter the "public domain." This may not be the most obvious or logical understanding of what "public disclosure" means, but it has taken root in the FOIA case law— especially FOIA case law relating to the CIA, which enjoys a very special and highly protected status among federal intelligence sources and methods.

Here, however, we have something like a "perfect storm" of a case— a situation in which the CIA appears to have ignored every safe harbor the courts have afforded it.

As regards the first prong of the *Ashfar* test for "public disclosure" or "official acknowledgement," this plaintiff—in contrast to all of the plaintiffs discussed above except SAGE and Salvatore Cottone—has been able both to identify the exact information that he wants, and to match it with information that was previously disclosed, in an admittedly authorized disclosure, to the "favored" reporters. That is because CIA has identified it for him, by producing to him, in redacted form, the emails identified in this record as Sun Ex. C, D, E, F

16

and G (ECF Document #17). Those emails, without redactions, were sent to the reporters at their workplace email addresses by the CIA's Office of Public Affairs. CIA concedes as much. There can be no dispute that whatever is blacked out from the emails that were produced to Johnson in response to his FOIA request is the exact information that was sent to Scott Shane, David Ignatius and Siobhan Gorman. Johnson wants nothing more—and nothing less—than what is underneath those redactions.

So thanks to CIA, Johnson is able—as so many plaintiffs before him were unable—to identify with precision the information he is seeking, and to match it with information that was disclosed to others by the Agency. The fact that he does not already have a hard copy of that information, and so does not know what it says under those black marks, does not mean that he has failed to meet his burden under the first prong of the *Ashfar* test, because *Cottone* stands for the proposition that Johnson need not have a hard copy or be able to quote the contents of the documents he seeks (if he could, he would not need to invoke FOIA) in order to meet his burden.

But that only gets plaintiff halfway home. Johnson must also prove that the information he seeks resides in the "public domain." Put otherwise, he must show that there exists a "permanent public record" of the information that was selectively disclosed. It is to that much more interesting question that I now turn.

The linchpin of all the "safe harbor" decisions discussed above is what we used to call "plausible deniability." When grappling with the possibility of waiver *via* selective and limited disclosure of classified information, courts clearly outlined a way for Government officials dealing with national security and foreign affairs material to have their cake and eat it, too. They could make disclosures to third parties when the Director deemed it necessary to protect intelligence sources and methods, and they could do so without waiving their right to invoke

17

relevant FOIA exemptions, as long as they did so in a way that created no permanent record outside the confines of the agency of exactly what was disclosed (exactly meaning, literally, "*in haec verba*"). In that way, the courts could never be entirely sure that whatever "public" record did exist (the notes taken by the people who were briefly shown the records at issue in *Muslim Advocates*, for example) was the "specific information" that had been disclosed previously. This bit of sophistry allowed the courts deny FOIA requests on the basis discussed in *Wilson v. CIA*, 586 F.3d 171, 186 (2d Cir. 2009).

Here, Johnson argues that CIA has managed to create the elusive permanent public record, because the information was disclosed to certain reporters (who are, of course, members of the public), not by showing it to them, but by sending it to them in a manner that allowed them to keep it. For Plaintiff and *Amici*, that is the difference that makes a difference.

In this case, unlike in previous cases, the reporter-recipients did not have to rely on their memories of conversations, or on notes quickly taken in a secure room; they got copies of the information in their email inboxes. Whatever understanding they may have reached with the CIA about how they would treat the disclosed information (about which the record is entirely silent), the reporters were presumably able to do what they liked with what they received: read the emails on screen -- maybe even on their tablets or cell phones, print them out, forward the electronic versions to other recipients, or share any printed copies with others. This, Plaintiff insists means that the CIA has managed to create the "permanent public record" necessary to bring the selective dissemination of otherwise-exempt information within the ambit of the public disclosure doctrine.

I cannot deny the allure of Johnson's argument. I do think the CIA was careless in this instance— especially given the generosity of courts in making sure that the Agency had a safe

18

harbor within which it could do what the Director deemed needful without jeopardizing its right to rely on the relevant FOIA exemptions.

Nonetheless, I conclude that Plaintiff has not satisfied the virtually insuperable burden of demonstrating the existence of a permanent public record that the case law imposes on him.

First, assuming arguendo that disclosure by sending emails to the reporter-recipients placed the emails in the public domain, Plaintiff offers the court no proof that the emails "remain" in the public domain. *See Judicial Watch,* 963 F.Supp. 2d at 15, citing *Davis,* 968 F.2d at 1279. There is no evidence that the reporter-recipients of the emails Plaintiff seeks have retained copies of those emails— that the emails still exist in unredacted form anywhere except at CIA heaquarters. For all we know, the emails were never printed out, never forwarded to anyone, never copied, and were deleted after reading by the reporter-recipients— sent to trash and trash emptied. Plaintiff certainly has not proven otherwise.

But of course we all know (to our sorrow) that email lasts forever. Efforts to rid oneself of all evidence of an unwanted or unwise communication sent *via* email is destined to fail; this because somewhere, in some electronic cloud, there exist pulses that can be reconstructed— whether by information technology professionals in the private sector or working for law enforcement, or even by nefarious hackers—into the original messages. Does this mean that the fact that emails were admittedly sent from the CIA to the reporter-recipients automatically creates a permanent public record of those messages?

This seems to be a matter of first impression, but the answer has to be no. Even though the emails in this case will reside for all eternity on the servers—the public, non-secure servers— of the three receiving newspapers, I do not believe that the CIA has created a permanent public record of its authorized disclosure.

For something to be "public," it has to, in some sense, be accessible to members of the general public. Assuming arguendo that the emails are as deleted as they can possibly be, the electronic impulses that can be used to reconstruct "copies" of the emails are not accessible to the general public. Even on those non-secure servers, they can be accessed only by (1) the intended recipients of those email messages (i.e., the three reporters); and (2) *authorized* users, such as IT professionals who work with and for the recipient newspapers, and who have both the ability and the authority to recover those emails.

Any other member of the public who wanted to obtain a copy of the unredacted emails from the servers of the *Times*, the *Post* and the Journal would have to steal that copy from the newspapers, by breaking into servers on which they are not authorized users and reconstructing and downloading messages that they are not authorized to receive. The cases cited above may not have dealt with information conveyed over the internet—indeed, many of them were decided before there was an internet—but no case suggests that the possibility of theft of confidential information by an unauthorized individual places that information in the public domain. Simply asserting that proposition reveals its fallaciousness.

For as long as there has been FOIA litigation, there existed the possibility that confidential information kept by the Government could be stolen out of a locked filing cabinet by a faithless employee, or by a spy who managed to infiltrate the location where it was kept. Today locked filing cabinets are becoming passé, but an unauthorized user who wanted to find out what was under the redactions in those five emails could, were he capable of doing so, hack into the CIA's "secure" server (from which the emails were sent) and download and publish unredacted copies of the messages. But disclosure of information obtained from the Government

20

in this manner would not waive the Government's FOIA protection, because it would not be an "authorized" disclosure.

I fail to see why the fact that the information exists in electronic form on some private organization's server, which server can theoretically be hacked by an unauthorized user, should be treated any differently. If the only way that information can be seen by the general public is by stealing it from an authorized recipient, logic dictates that the information is not available to the general public— it is not "in the public domain." Plaintiff and Amici make a good deal out of the fact that the newspapers' servers are not secure servers, but I do not believe that the security level of a sending or receiving server makes the slightest difference to the analysis.

So Plaintiff fails because he is unable to demonstrate that the information he seeks resides today in the public domain; assuming, for purposes of argument, that the CIA's decision to email the information to the reporters placed it there.

There is another reason why one cannot conclude that these particular emails are in the public domain. Even if there were a copy of the emails in the files of Mr. Shane or Mr. Ignatius or Ms. Gorman, or even if the reporter-recipients could still readily call up the full text on their computers, there is no evidence in the record that any member of the public could walk into the offices of the Times or the WaPo or the WSJ and demand to see a copy. For that matter, there is no evidence that anyone could obtain the information *via* service of a subpoena on the reporter-recipients. This court would be shocked if the three eminent news organizations whose employees received these emails did not fight tooth and nail against any effort to make them public; and as I understand matters, the law is on their side. If that were not so, Johnson would not be asking the CIA to disclose the redacted information; he would be suing the *New York Times*, the *Washington Post* and the *Wall Street Journal*.

21

In short, selective disclosure of protectable information to an organ of the press, which guards the privacy of its own sources and methods as zealously as does the CIA, in circumstances like the circumstances of this case, and for the reasons offered by the Director in camera to this court, does not create a "truly public" record of that information. *Niagara Mohawk*, 169 F.3d at 19, cited in *Cottone*, 193 F. 3d at 554.[7]

## CONCLUSION

The public disclosure doctrine "is premised upon the logic that a FOIA exemption can no longer serve its purpose when there is a permanent public record of the requested information," *Muslim Advocates, supra.*, 833 F. Supp 2d at 101, n.7, citing *Cottone, supra.*, 193 F.3d at 554. Despite the CIA's carelessness in not ensuring that every copy of the information it disclosed remained within its custody—thereby giving it the benefit of a carefully crafted "safe harbor" that has long been recognized by the courts—the plaintiff in this case and the Amici that support his quest have not proven that there exists a permanent public record of the information they are requesting. For that reason, I conclude that the CIA's motion for summary judgment should be granted, and that plaintiff Johnson's cross motion for summary judgment should be denied.

---

[7] I need not and do not decide whether the fact that the reporter-recipients have not further disclosed the redacted information means that the information is not "public," as Judge Contreras, my colleague in Washington D.C., held in *Judicial Watch, supra*. My understanding of waiver is that it can only be accomplished by the party invoking the privilege (which is to say, by the Executive Branch in a FOIA case), not by any third party. That being so, I am skeptical that a third-party recipient's silence is of any legal significance to whether the CIA waived the protection of Exemptions 1 and 3 by making limited selective disclosure. Especially in the case of the CIA, the rule of *Wilson v. Central Intelligence Agency*, 586 F.3d 171 (2d Cir. 2009), discussed in footnote 3, *supra.*, appears to be to the contrary.

22

This constitutes the decision and order of the court.

Dated: April 11, 2018

_____
Chief Judge

TO BE PROVIDED BY HAND TO THE GOVERNMENT FOR REVIEW